UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:09-CV-284-H

BRANCH BANKING & TRUST COMPANY,                                      PLAINTIFF
as Trustee of the Charles A. Brown & Elise A. Brown
Irrevocable Life Insurance Trust

V.

PACIFIC LIFE INSURANCE COMPANY                                       DEFENDANT

**MEMORANDUM OPINION AND ORDER**

Branch Banking & Trust Company ("BB&T"), as Trustee for the Brown family, brought an action for breach of contract against Pacific Life Insurance Company ("Pacific Life") in connection with an exchange of life insurance policies pursuant to Section 1035 of the Internal Revenue Code. The parties wish to receive guidance on the Court's likely instructions to the jury, particularly on the issue of damages, and have filed motions for partial summary judgment addressing those issues. The Court has carefully considered them.

I.

The Court reiterates and incorporates by reference the facts set forth in the Sixth Circuit opinion and will repeat them here as necessary.

BB&T is Trustee of the Brown family's trust, which was funded by a Pacific Life variable life insurance policy (the "Policy"), which BB&T owned. In early 2008, Walter Koczot became the BB&T representative handling the trust. In August 2008, BB&T sought to substitute a John Hancock policy for the Pacific Life Policy. To do so, it decided upon a tax-free exchange of the policies under Section 1035 of the Internal Revenue Code. Such an exchange would

require three steps: (1) BB&T transfers ownership of the Policy to John Hancock, (2) John Hancock surrenders the Policy and uses the proceeds to purchase a John Hancock policy, and (3) John Hancock assigns the new policy to BB&T.

BB&T initiated the Section 1035 process on August 18, 2008, executing a valid assignment of the Policy to John Hancock. Next, John Hancock submitted an assignment and surrender request to Pacific Life, executed by BB&T Vice President Walter Koczot and John Hancock representative Jonathan Squire. Pacific Life received it on September 9, 2008. The same day, Pacific Life sent a letter to John Hancock acknowledging receipt of the Section 1035 request but stating that the documents were incomplete; that is, not to its satisfaction. To be complete, Pacific Life required BB&T's corporate officer Walter Koczot's signature to include title and corporate seal or notary.

On September 19, 2008, a BB&T employee at a different branch who was not otherwise involved in this Section 1035 exchange received an email notification of the additional requirement from John Hancock. On October 1, 2008, the correct BB&T branch called Pacific Life to inquire about the exchange. Not until December 11 did BB&T comply with Pacific Life's requirement.

Thereafter, BB&T filed this lawsuit to recover the Brown family's loss. This Court reasoned that the Policy's surrender provision constituted an outstanding, irrevocable offer that John Hancock accepted on September 9. It further reasoned that Pacific Life had every right to assure the request was in a form "satisfactory to PL," but that did not affect the effective date of September 9 or the unconditional nature of the original surrender request.

The Court also determined that BB&T was entitled to the full difference in the value of the investment on September 9, the effective date of the surrender, and the value of the

investment on December 11, or $259,926.33 plus interest. The Court reasoned that mitigation was not appropriate in this context, when liquidated damages were certain and based on contract surrender requirements.

On appeal, the Sixth Circuit found genuine issues of material fact as to when the Policy was properly surrendered. The Sixth Circuit explained that the inclusion of the language "satisfactory to PL" was legally significant and factually unclear. Therefore, a jury must decide "whether Pacific Life's decision [to require title and corporate seal or notary along with Koczot's signature] was reasonable, that is, whether Pacific Life did, in fact, received a 'satisfactory' surrender request on September 9, 2008." The Sixth Circuit did not consider the issue of damages.

The parties have now filed competing motions asking the Court to set forth the jury instructions and other rulings applicable to any trial of this case.

II.

The primary jury instructions are actually quite straightforward. Although the version set forth below could be subject to change upon discussion with the parties, the Court intends to instruct as follows:

> "1. **You must determine whether Pacific Life was reasonable in requiring title and corporate seal or notary with Walter Koczot's signature to complete the surrender request.**

Pacific Life may impose requirements upon a surrender request which allow it to be objectively satisfied that the request is legitimate. In deciding whether Pacific Life's requirements were reasonable, you must decide whether the surrender request was objectively satisfactory from Pacific Life's perspective. You should not consider Pacific Life's subjective viewpoint.

You can, but are not required to, consider the following, as well as anything else you find relevant to your determination:

1. Whether Pacific Life had a reason to seek assurances of proper assignment from BB&T;

2. Whether Pacific Life's prior communications to BB&T representative Walter Koczot demonstrated its recognition of Koczot as BB&T's authorized agent prior to August 2008;

3. Whether it is Pacific Life's practice or policy to request a notarized signature or corporate seal in similar circumstances; and

4. Whether it is the custom of the life insurance industry to request such additional information.

If you find that Pacific Life's requirement was reasonable, enter a verdict for Pacific Life under Question 1 of the Verdict Form. If you find that Pacific Life's requirement was unreasonable, enter a verdict for BB&T under Question 1 of the Verdict Form."

III.

The question of damages, depending upon the two potential jury verdicts, presents quite a few more difficult issues. The parties have two very different conceptions of how damages should be determined. The Court will first discuss damages should a jury find that Pacific Life was reasonable in determining that the surrender request was unsatisfactory and requiring further action. Then the Court will discuss damages should a jury find that Pacific Life was unreasonable.

A.

The Court has never reached the question of damages in the event Pacific Life is found to have acted reasonably. Pacific Life argues that BB&T would not be entitled to any damages. BB&T, on the other hand, argues that the jury should have to decide a second breach of contract

4

question: whether Pacific Life notified BB&T in accordance with the Policy's terms that the surrender request was unsatisfactory.

The Policy provided that Pacific Life would send any premium or "other notice" regarding the Policy to the policy owner. The Policy's integration clause provided that it, along with other enumerated documents, was the entire contract, which could only be modified in writing by an officer of Pacific Life. On September 9, 2008, John Hancock was the undisputed owner of the Pacific Life Policy by virtue of BB&T's assignment initiating the Section 1035 process. The parties agree that on September 9, Pacific Life sent proper notice of its demand for a notarized signature or corporate seal to John Hancock. Having done so, Pacific Life complied with its contractual notice obligations. Neither the parties nor the Court can identify any other legally mandated notice requirements.

BB&T advances several circumstantial or logical arguments in favor of a notice obligation.[1] It argues that Pacific Life understood that John Hancock's surrender request was made as part of a Section 1035 exchange. It points out that Pacific Life sent a letter to BB&T on September 9, 2008 stating that "Pacific Life has been advised by John Hancock that 'your Pacific Life policy may be replaced.'" It notes that Pacific Life did not concede the validity of the assignment until May 2010, in rebuttal to BB&T's notice argument.

While these arguments might inform what Pacific Life should have done as a business, they do not dictate what Pacific Life was legally obligated to do. As a legal matter, arrangements between BB&T and John Hancock, if any, were of no consequence to Pacific Life. Pacific Life notified the policy owner, John Hancock, on the day it received the surrender request

---

[1] BB&T also argues that Pacific Life had no valid reason to seek assurances of the authenticity of BB&T Vice President Koczot's signature as to the surrender request while accepting it for the assignment. However, this argument goes to the reasonableness of Pacific Life's notarization requirement, not Pacific Life's legal notice obligation.

in the manner specified on the surrender request. John Hancock could have forwarded the communication to the former policy owner, BB&T, on September 9. Ultimately, although best business practices may be to notify the former policy owner directly, nowhere in the Policy is Pacific Life legally obligated to do so.

For this reason, the question of notice need not be submitted to the jury. If the jury finds that Pacific Life acted reasonably, BB&T will not be entitled to any damages.

B.

Finally, the Court addresses damages in the event Pacific Life is found to have acted unreasonably. The core issue here is mitigation. If Pacific Life's requirement was unreasonable, the effective date of the surrender request was September 9, 2008.[2] As a matter of law, BB&T had no duty to comply with an unreasonable request. The Court previously determined that it could find "no sound principle of mitigation which it could apply logically or ascertainably in these circumstances." Pacific Life asks the Court to reconsider whether, at some point between September 9 and December 11, 2008, BB&T had a duty to mitigate its damages. If BB&T had no duty to mitigate, its damages are $259,926.33; if it had a duty to mitigate, its damages could be reduced. The parties do not dispute that throughout the contested period BB&T retained the right and power to effect investment decisions by sending written instructions to Pacific Life. In essence, Pacific Life argues that BB&T must prove its damages rather than be entitled to them by operation of law.

The Court has reviewed its prior writing and the fine arguments of counsel, and has given the matter considerable thought. In truth, there is no certain answer to the questions which the parties dispute. This is a question of Kentucky state law. In its prior Memorandum, the Court

---

[2] The Policy provides: "Surrender - Upon written request while either insured is living you may surrender this policy for its Net Cash Surrender Value. The policy will terminate on the date the request is received at the Home Office."

cited an older case for the sound proposition that "[w]hile under the rule in damages cases it is the duty of a party to use ordinary care to minimize damages, this rule has no application to a contract to pay absolutely a certain sum of money." *Superior Woolen Co. Tailors, Inc. v. M. Samuels & Co., Inc.,* 293 S.W. 1078, 1079 (Ky. 1927). The Court viewed the current contract as an obligation to pay a certain sum of money, that is, the Policy's net cash surrender value on the date the surrender request was effective. In addition, the Court pointed out that the account had a known, certain value on December 11, 2008, when the request was processed. Therefore, damages could be precisely valued. The Court further stated that this dispute would not be before the Court if market circumstances had differed, and whatever way the Court ruled, the losing party could view the result as unfair. In these circumstances, the apparent Kentucky rule appeared applicable as well as reasonable.

Pacific Life has advanced new arguments questioning the Court's application of the logic in *Superior Woolen* to the current circumstances. Pacific Life is correct to point out that the *Superior Woolen* rule has not been applied outside the context of real estate. *See Moore v. Rogers*, 43 S.W.2d 31, 32 (Ky. Ct. App. 1931) (applying to fixed-term lease); *Davis v. Citibank N.A.*, 2010 WL 1404446, at *2 (Ky. Ct. App. Apr. 9. 2010) (applying to a rent-to-own agreement); *In re Kmart Corp.,* 290 B.R. 601, 608 (Bankr. N.D. Ill. 2002) (applying to lessors of real property); *Dulworth v. Hyman*, 246 S.W.2d 993, 996 (Ky. 1952) (citing *Superior Woolen* in support of: "We have consistently held that a landlord is not bound, upon vacation of the premises by the tenant during the term, to secure another tenant in order to minimize damages."); *In re Dant & Dant of Kentucky*, 39 F. Supp. 753, 758 (W.D. Ky. 1941) *aff'd sub nom. Kessler v. Jefferson Storage Corp.,* 125 F.2d 108 (6th Cir. 1941) (acknowledging the limited applicability of the rule). However, our case arises from unusual circumstances. Kentucky courts have not

prohibited the *Superior Woolen* rule's application outside of the leasing context. And *In re Dant & Dant* explained that the circumstances of some cases make it "unreasonable to expect [mitigating] steps to be taken." 39 F. Supp. at 758. The question is whether the sound principles that underpin *Superior Woolen* apply here as well.

This Court is tasked with predicting how the Kentucky Supreme Court would apply state law in these circumstances. It is true that Kentucky generally imposes a duty to mitigate on nonbreaching parties, but the Kentucky Supreme Court has clearly stated that the mitigation requirement "has no application to a contract to pay absolutely a certain sum of money." *Superior Woolen*, 293 S.W. at 1079. This is in conformity with basic principles of mitigation. *See* 25 Williston on Contracts § 66:96 (4th ed.) ("Where the defendant is under a unilateral or independent contractual obligation to pay a liquidated sum of money, the ordinary measure of damages for nonperformance is the sum of money itself with interest at the legal rate from the time when performance was due . . ."). Because a contract to pay a certain sum of money exists here, it would seem that the *Superior Woolen* and Williston logic may also apply.

Pacific Life cites decisions of courts outside Kentucky that require a nonbreaching party to mitigate in the securities context. However, the securities context does not provide a perfect parallel to our case, which, at its core, involves a contract to pay a sum of money. Pacific Life promised to pay out the Policy's net cash surrender value as of the date it received the policy owner's surrender request. This payment happened to be funded by a sale of securities.

Most fundamentally, in our case, determining how to mitigate would have been a matter of pure speculation. At the time of Pacific Life's unreasonable request, BB&T was entitled to the Policy's net cash surrender value on September 9. At that point, it was unknown how this value would be affected in the future by market forces or any potential alternate investment

decisions. The Court can find "no sound principle of mitigation which it could apply logically or ascertainably in these circumstances."

Relatedly, Pacific Life has raised the issue of causation, arguing in essence that BB&T must prove its damages—that is, it must prove that the funds would have fared better from September 9 to December 11 in a similar investment account with John Hancock than they did during that period while invested with Pacific Life. It urges the Court to examine what would have happened after the Section 1035 exchange. However, this inquiry moves beyond the contract provisions at issue here.

The goal of compensatory damages is to put the nonbreaching party where it would have been had the breaching party performed its promise. The agreement at issue was: upon satisfactory written request of the policy owner, Pacific Life promised to carry out a Section 1035 exchange. In other words, upon request, Pacific Life would liquidate the assets and transfer the net cash surrender value of the Policy to the policy owner. Once BB&T assigned the Policy and John Hancock submitted a satisfactory surrender request, their contract obligations were fully performed. Had Pacific Life performed its promise, Pacific Life would have liquidated and transferred the net cash surrender value of the Policy on September 9, 2008 to John Hancock. At that point, the agreement would have been fully executed. Anything that may or may not have happened after that date does not affect the contract between the parties, and associated predictions rest on nothing but pure speculation.

For these reasons, the Court concludes that should the jury find that Pacific Life's surrender request requirements were unreasonable, BB&T is entitled to the ascertainable difference between the net cash surrender value of the Policy as of September 9, 2008 and the net cash surrender value of the Policy as of December 11, 2008, that is, $259,926.33.

Finally, the Court incorporates and reiterates its discussion of prejudgment and post-judgment interest in its prior opinion. In the event BB&T is entitled to damages, it will also be entitled to prejudgment interest at the statutory rate of 8 percent and post-judgment interest at the rate of 12 percent in accordance with Kentucky law.[3]

Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that the motions for summary judgment are DENIED and the Court will conduct the trial of this case consistent with this Memorandum Opinion.

cc: Counsel of Record

---

[3] For a discussion of the applicable interest rates, see the Court's prior opinion, ECF No. 58. Plaintiff appeared to have abandoned its claim for post-judgment interest in its motion for partial summary judgment. However, Plaintiff reinserted it in its corresponding proposed order and reasserted it while in conference with the Court and Defendant. For this reason, the Court will find this claim remains.